UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

JOSEPH D. McDONALD,

     *Plaintiff*,

   - against -

CITY OF NEW YORK and NEW YORK CITY
DEPARTMENT OF TRANSPORTAION,

     *Defendants*.

----------------------------------------X

**MEMORANDUM & ORDER**

08-CV-2371 (KAM)(LB)

**MATSUMOTO**, UNITED STATES DISTRICT JUDGE:

     Plaintiff Joseph D. McDonald ("plaintiff" or

"McDonald") brings this action[1] against the City of New York and

the New York City Department of Transportation ("DOT")

(together, "defendants") alleging employment discrimination and

retaliation on the basis of his disability in violation of the

Americans with Disabilities Act, as amended, 42 U.S.C. §§ 1201

*et seq.* ("ADA" or "the Act").[2]  (See generally, ECF No. 1,

---

[1]    Although in their moving papers defendants have described plaintiff as
proceeding *pro se*, the record reflects that in fact, plaintiff is represented
by counsel.  (See, e.g., ECF Nos. 39, 40, Notices of Appearance by William
Roché and Assad Ali Bhatti on behalf of plaintiff.)

[2]    In 2008, Congress passed the Americans with Disabilities Act Amendments
of 2008 ("ADAA") to amend the ADA and expand its coverage.  See Pub. L. 110-
325, 112 Stat. 3553 (2008).  However, because there is "no indication that
Congress intended" the ADAA to apply retroactively, the court applies the
version of the ADA in effect during the relevant time period, which ended
with plaintiff's termination on January 9, 2008.  See Wega v. Center for
Disability Rights, Inc., No. 09-cv-4511, 2010 U.S. App. LEXIS 20948, at *3
n.1 (2d Cir. Oct. 8, 2010); see also Ragusa v. Malverne Union Free School
Dist., 381 Fed. App'x 85, 88 n.2 (2d Cir. 2010) ("Although Congress amended
the ADA in 2008 to expand its coverage . . . we here apply the version of the
statute in effect during the time period at issue . . . .").  Accordingly, as
undisputed by the parties, the pre-ADAA version of the ADA applies here and
is thus considered by the court.

Complaint ("Complaint" or "Compl.") at 1.)[3]  In addition, for the

first time in his opposition to defendants' motion for summary

judgment, plaintiff asserts that he intended to raise claims

specifically under the New York State Executive Law Section 296

("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

(See id. at 2 (asserting "any related claims under New York

law"); see also ECF Nos. 41-27, 41-28, Memorandum of Law in

Opposition to Defendants' Motion for Summary Judgment dated

5/31/2010 ("Pl. Mem.") at 19.)  Plaintiff alleges that DOT

discriminated against him because of his disability, namely his

herniated disc in his cervical-lumbar areas, failed to promote

him, failed to provide a reasonable accommodation, and

retaliated against him for registering a discrimination charge

with the New York State Division of Human Rights.  (See id. ¶¶

4, 7, 8E, 9.)

    After completing discovery, defendants move for

summary judgment and seek dismissal of plaintiff's action

pursuant to Federal Rule of Civil Procedure 56.[4]  For the reasons

---

[3]    The paragraph citations to plaintiff's unnumbered Complaint are derived
from the numbered version of the Complaint provided by defendants.  (See
Declaration of Pinar Ozgu dated 2/26/2010 ("Ozgu Decl.").)

[4]    The parties have made the following submissions in connection with the
instant motion for summary judgment: ECF No. 47, Defendants' Notice of Motion
for Summary Judgment and accompanying documents; ECF No. 48, Memorandum of
Law in Support of Defendants' Motion for Summary Judgment dated 2/26/2010
("Def. Mem."); ECF No. 41, Declaration of William A. Roché in Opposition to
Defendants' Motion for Summary Judgment dated 5/31/2010 ("Roché Decl.") and
accompanying documents; Pl. Mem.; ECF No. 49, Reply Memorandum of Law in
Further Support of Defendants' Motion for Summary Judgment ("Def. Reply
Mem.").

set forth below, defendants' motion is granted and plaintiff's

Complaint is dismissed in its entirety.

**FACTUAL BACKGROUND**

The facts pertinent to this motion, either undisputed

or, where disputed and supported by competent evidence, taken in

a manner most favorable to plaintiff, are as follows.

**A. Plaintiff's Employment with DOT**

Plaintiff commenced employment with DOT on October 27,

1997 as a civil service Traffic Device Maintainer ("TDM").

(Defendants' Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 5.)  TDMs

generally perform a variety of duties depending on their

assignments.[5]  (Declaration of Michael Greco in Support of

Defendants' Motion for Summary Judgment ("Greco Decl.") ¶ 5.)

Plaintiff's assignment as a TDM was to the Facilities

Management Unit of the Parking Division,[6] where his primary, but

not exclusive, duty was painting. (Plaintiff's Rule 56.1

Statement ("Pl. 56.1 Stmt.") ¶ 10.)  The assignment of TDMs is

---

[5]     The various duties of TDMs include, but are not limited to, painting
lines on roadways to facilitate the movement of traffic, installing traffic
signs and supports, repairing and retiming traffic meter mechanisms,
repairing and installing meter housings, cleaning fields and garages of
debris, painting and/or repairing roadways and sidewalks and the
surrounding area of parking fields, pumping flooded areas and clearing drains
of all debris, maintaining structures on parking facilities, taking traffic
counts by means of an automatic traffic recorder, repairing automatic traffic
recorders, and placing and maintaining traffic control equipment for
reversible bus lanes.  (See Greco Decl. ¶ 5.)

[6]     Although the parties appear to interchangeably refer to the site of
plaintiff's pre-injury position as a TDM, for consistency, the court will
refer to the unit as the "Facilities Management Unit" of the Parking
Division.

handled pursuant to contractual rules established through a memorandum of agreement signed between the City of New York and the plaintiff's union, District Council 37, AFSCME, AFL-CIO ("union pick contract"). (Def. 56.1 Stmt. ¶ 8.) The union pick contract provides that TDMs with a satisfactory job evaluation desiring a reassignment to a specific unit or job skill can submit a transfer request form in which the TDM may bid for up to three positions.[7] (Id.; Ozgu Decl., Ex. C ¶ 2.)

Prior to sustaining the injuries pertinent to the present litigation, throughout his career at DOT plaintiff had always remained in good standing and received satisfactory employment evaluations. (Pl. 56.1 Stmt. ¶ 12.) Moreover, plaintiff had never had any charges filed against him by his employer, nor was he ever reprimanded for any reason. (Id. ¶ 11.)

## B. Plaintiff's Accident and Injury

On July 12, 2004, shortly after leaving work and pulling out of the DOT parking lot, plaintiff was involved in an automobile accident in which he sustained injuries to his neck and back. (Def. 56.1 Stmt. ¶ 9; Pl. 56.1 Stmt. ¶¶ 13-14.)

---

[7]     Plaintiff disputes this characterization of the union pick contract's terms asserting that TDMs have been transferred to different locations and job picks without utilizing the union pick contract (see Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. Response") ¶ 8; see also Declaration of Joseph D. McDonald in Opposition to Defendants' Motion for Summary Judgment dated May 31, 2010 ("McDonald Decl.") ¶ 57), but this dispute is not material to the court's analysis on the instant motion.

Specifically, plaintiff suffered a herniated disc in the cervical and lumbar areas, which has caused him constant pain in varying degrees and limited his dexterity, his abilities to operate heavy machinery and drive an automobile. (Pl. 56.1 Stmt. ¶¶ 14-21.) As a result, immediately following the accident plaintiff was placed on medical leave until he returned to work on October 17, 2005 on a so-called "limited duty assignment." (Id. ¶ 26; Def. 56.1 Stmt. ¶ 25.)

Plaintiff has testified that his injury limited his ability to bend "as much as what somebody else may be able to do," (Ozgu Decl., Ex. F, Deposition of Joseph D. McDonald ("Pl. Dep.") at 83:16-21.), and that while he can bend somewhat at the waist, he cannot "touch [his] toes or bend down to like a 90-degree angle." (Id. at 83:25-84:3.) Plaintiff has described how "sometimes [he] ha[s] very bad days and sometimes the days aren't as bad." (Id. at 78:22-23.) As a result of plaintiff's chronic pain, plaintiff is on a daily regimen of pain medication, which "hinders his dexterity, as well as his ability to operate heavy machinery and drive." (Pl. 56.1 Stmt. ¶ 21.) Plaintiff's injuries have also affected his ability to sleep and plaintiff has had to adjust his method of sleeping, placing pillows under his neck and back, and on his side, in order to alleviate the pain. (Id. ¶ 24.) Moreover, plaintiff's injuries have "resulted in sciatica, which leaves his right leg and left

foot numb." (Id. ¶ 22.) The pain he associates with the sciatica problem is "constant and medication does not help." (Id.) As a result of the injuries plaintiff sustained in July 2004, plaintiff has reported undergoing "extensive physical therapy, heat treatments, epidural injections" and acupuncture treatments. (Id. ¶¶ 17, 19.)

## C. Limited Duty Assignment Procedures

Prior to 2010,[8] when a qualified DOT employee was unable to perform the full duties of his or her position, DOT policy allowed that employee to request "a work assignment for a specified period of time to perform duties which an ill or injured employee is capable of performing," known as a 'Limited Duty Assignment.' (Ozgu Decl., Ex. J, Department of Transportation Limited Duty Policy ("DOT Limited Duty Pol.") at SDHR 00096; see also Ozgu Decl. Ex. K, Department of Transportation Limited Duty/Extended Sick Leave Grant Policy ("DOT Limited Duty/Sick Leave Pol.") at 1; Def. 56.1 Stmt. ¶ 12.) Such assignments were considered temporary and thus "used as a transition between the time when an employee is unable to perform his or her full duties as a result of illness or injury and the time an employee can return to full duty." (DOT Limited

---

[8]    DOT abolished its procedures in connection with Limited Duty Assignments in 2010 and ceased providing such assignments in 2008. (Def. 56.1 Stmt. ¶ 12, n.3; Declaration of Valerie Coleman in Support of Defendants' Motion for Summary Judgment dated February 26, 2010 ("Coleman Decl.") ¶ 3, n.2.)

Duty Pol. at SDHR 00096; Def. 56.1 Stmt. ¶ 12.)  Accordingly,
except in limited circumstances, the assignment was not to
exceed one year's duration.  (DOT Limited Duty Pol. at SDHR
00096; DOT Limited Duty/Sick Leave Pol. at 1.)

Such Limited Duty Assignments were subject to DOT
discretion and "the availability of suitable limited duty
positions."  (DOT Limited Duty/Sick Leave Pol. at 1.)  Further,
DOT policies and procedures in connection with such assignments
provided that "limited duty assignments may necessitate a change
of work location or a change of shift for the employee."  (Id.)
Moreover, prior to any Limited Duty Assignment, a physician's
authorization was required.  (Def. 56.1 Stmt. ¶ 17.)
Specifically, a requesting employee was required to complete and
submit a Limited Duty Assignment request and physician
certification indicating those tasks that the employee would be
capable of performing in light of the employee's physical
limitations, along with a Tasks and Standards Sheet completed by
the employee's physician.  (See Def. 56.1 Stmt. ¶ 14; DOT
Limited Duty Pol. at SDHR 00097; see also DOT Limited Duty/Sick
Leave Pol. at 1-2.)

In order for an employee to request a Limited Duty
Assignment, the employee had to first obtain a limited duty
request application form, a physician certification form, and a
current Task and Standards Sheet corresponding to their position

from their supervisor.  (Def. 56.1 Stmt. ¶ 14; DOT Limited Duty

Pol. at SDHR 00097; <u>see also</u> DOT Limited Duty/Sick Leave Pol. at

1-2.)  The employee's physician would then need to review the

Task and Standards Sheet and indicate in the physician

certification which of the tasks and standards the employee was

and was not capable of performing.  (Def. 56.1 Stmt. ¶ 14; DOT

Limited Duty Pol. at SDHR 00097.)  Attaching all completed

forms, the employee would then submit the request for a Limited

Duty Assignment to his/her supervisor who would in turn review

the application and forward it to the unit's personnel liaison.

(Def. 56.1 Stmt. ¶ 14; DOT Limited Duty Pol. at SDHR 00097.)

Several DOT offices would then review the completed

application.  (Def. 56.1 Stmt. ¶ 14.)  First, after reviewing

the request for completeness, the personnel liaison would

forward the application to the Personnel Coordinator.  (<u>Id.</u>)

According to Valerie Coleman ("Coleman"), who served as DOT

Personnel Coordinator from June 1998 through May 2007, the

Personnel Coordinator would then review the request, and

generally attempt "to ascertain if a suitable assignment"

existed in the unit where there employee had served "in full

duty capacity."  (Coleman Decl. ¶ 7.)  If no such assignment in

the employee's full duty unit was available, then the Personnel

Coordinator would contact "other divisions and/or units within

Traffic Operations to ascertain if an appropriate limited duty

assignment for the injured employee was available." (Id.; Def. 56.1 Stmt. ¶¶ 14, 17.)

Upon completing this review, the Personnel Coordinator would then forward the request to the Safety and Health Division, which would set up an appointment with the DOT's Limited Duty Review Board (the "Review Board"), the body tasked with "reviewing, approving, and granting limited duty assignments." (Coleman Decl. ¶ 5; see also Def. 56.1 Stmt. ¶ 14.) This Review Board was comprised of employees from the Division of Human Resources and the EEO office, as well as a representative from the requester's DOT division. (Def. 56.1 Stmt. ¶ 13.) At the meeting, the Review Board would review the available Limited Duty Assignments with the employee and his union representative. (Id. at ¶ 14.) Further, once assignments had been made, DOT policy required submission of "progress reports by the employee's physician or other health care provider every 60 days," and the Review Board's review of Limited Duty Assignments "on a bi-monthly basis." (Id. ¶¶ 13, 15.)

A new Tasks and Standards sheet would then be prepared indicating the employee's duties for the Limited Duty Assignment. (See DOT Limited Duty Pol.) Employees serving in a Limited Duty Assignment "were expected to perform the essential functions of their temporary positions, subject to their

physical limitations." (Def. 56.1 Stmt. ¶ 17.) The supervisors
of employees on limited duty assignments were "required to
notify their respective Personnel Coordinators of any employees
on a Limited Duty Assignment who [were] not performing their
Limited Duty Assignments in a satisfactory manner," and if an
such "employee on a Limited Duty Assignment [was] excessively
late or excessively absent from his/her Limited Duty
Assignment." (DOT Limited Duty/Sick Leave Pol. at 3.) Once a
Limited Duty Assignment reached the one-year mark, the employee
was required to "either return to full duty or leave City
service, except under the most unusual circumstances." (Id.)
If the employee was unable to return to full duty, he or she
could "take full advantage of whatever benefits he or she [was]
entitled to through disability or retirement." (Id.)

### D. Plaintiff's Initial Requests for Limited Duty Assignment in the Facilities Management Unit of the Parking Division

While out on medical leave, plaintiff submitted a
number of Limited Duty Assignment requests to the DOT. (Def.
56.1 Stmt. ¶ 18.) First, on April 14, 2005, plaintiff submitted
a request for a Limited Duty Assignment. (Id.; Pl. 56.1 Stmt. ¶
27.) Plaintiff's request was accompanied by a certification
completed by his physician, Dr. Pinckney, dated April 14, 2005,
and a Tasks and Standards Sheet for TDMs, which indicated the
TDM tasks plaintiff's physician determined that plaintiff could

and could not perform.  (Def. 56.1 Stmt. ¶ 18; Pl. 56.1 Stmt. ¶

27.)  Specifically, of the 23 tasks listed for TDMs, Dr.

Pinckney indicated that plaintiff was able to perform 13, and

unable to perform 10. (Pl. 56.1 Stmt. ¶ 27; Ozgu Decl., Ex. L,

Certification of Physician or other Health Care Provider Request

For Limited Duty Assignment dated April 14, 2005 ("Pinckney

Certification 4/14/05").)

Defendants assert that the Tasks and Standards Sheet

evaluated by plaintiff's physician and submitted by plaintiff in

support of plaintiff's first Limited Duty Assignment request was

inapplicable to plaintiff's requested assignment.  Namely,

defendants state that the Tasks and Standards Sheet submitted by

plaintiff did not reflect the particular tasks and standards

specifically applicable to plaintiff's requested position at the

Facilities Management Unit of the Parking Division, but instead,

reflected an exhaustive list of the duties potentially

applicable to all TDM positions depending on the assigned

division.  (Def. 56.1 Stmt. ¶ 19.)  According to defendants,

this discrepancy prompted Coleman to send a letter to plaintiff

on April 27, 2005 informing plaintiff "that the tasks and

standards used by his physician were not the applicable

standards for plaintiff's current job," and requesting that

plaintiff have his physician reevaluate plaintiff's capabilities

based on the enclosed Tasks and Standards Sheet which pertained

to plaintiff's current position in the Parking Division.[9]  (Def. 56.1 Stmt. ¶ 19; Coleman Decl. ¶ 12.)

Plaintiff notes, however, that the amended Tasks and Standards Sheet provided by Coleman appears to be "simply the *same* Tasks and Standards Sheet provided to [plaintiff] previously which his physician completed on April 14, 2005 *with pages 2, 5, 6, and 7 removed*."  (Pl. 56.1 Stmt. ¶ 32 (emphasis in original) (internal citations omitted); compare Pinckney Certification 4/14/05 with Roché Decl., Ex. 6, Certification of Physician or other Health Care Provider Request For Limited Duty Assignment dated May 18, 2005 ("Pinckney Certification 5/18/05").)  Yet although the amended Tasks and Standards Sheet did not include any tasks that did not appear in the original list on which Dr. Pinckney based his initial evaluation, all but one of the tasks that Dr. Pinckney indicated that plaintiff could perform in the April 14, 2005 Certification were omitted from the amended Tasks and Standards Sheet.  (See Pl. 56.1 Stmt. ¶¶ 32, 33.)

Plaintiff submitted revised limited duty requests accompanied by new Certifications from his physician dated May

---

[9]    Plaintiff does not dispute Coleman's April 27, 2005 letter or the rationale it provided for the amended Tasks and Standards Sheet.  (See Pl. 56.1 Stmt. ¶ 29.)  Plaintiff disputes, however, the characterization that the initial Tasks and Standards Sheet submitted by plaintiff's physician was inapplicable for plaintiff's requested position and attributes Coleman's provision of the amended Tasks and Standards Sheet to an ulterior, impermissible discriminatory motive.  (See Pl. Response ¶¶ 19, 38.)

18, 2005 and July 28, 2005 indicating that, based upon the amended physician's evaluation of the revised Tasks and Standards Sheet, plaintiff could only perform task 13: "Take traffic counts by means of an automatic traffic recorder." (Pl. 56.1 Stmt. ¶¶ 34, 35; Ozgu Decl., Exs. N-O; Roché Decl., Exs. 6-7.) On September 9, 2005, the Review Board determined that because plaintiff "cannot perform any of the primary functions of [his] title," no Limited Duty Assignment was available for plaintiff. (Def. 56.1 Stmt. ¶ 23; Pl. 56.1 Stmt. ¶ 36; Ozgu Decl., Ex. P, Limited Duty Review Board Determination dated September 9, 2005.) The Review Board therefore denied plaintiff's April 14, May 18, and July 28, 2005 requests for a Limited Duty Assignment in the Facilities Management Unit of the Parking Division. (Id.)

### E. Plaintiff's Fourth Request for a Limited Duty Assignment and Subsequent Assignment at the Counter Shop[10]

On August 20, 2005, plaintiff submitted a second request for a Limited Duty Assignment, this time for a position at the Counter Shop. (Def. 56.1 Stmt. ¶ 24; Ozgu Decl., Ex. Q, Limited Duty Assignment Request dated August 20, 2005.) Plaintiff included with his request a Certification from his physician indicating that, based upon the physician's review of

---

[10]     While the parties variously refer to this entity as the "count" shop or "counter" shop, the court, in the interest of consistency, refers exclusively to the "Counter Shop."

the "Count[er] Shop Standards and Operations Procedure,"
plaintiff was capable of performing "all duties in the 'counter
shop.'" (Def. 56.1 Stmt. ¶ 24; Ozgu Decl., Ex. Q.) Based upon
these submissions, the Review Board approved plaintiff's request
for a Limited Duty Assignment to the Counter Shop on October 14,
2005, and plaintiff was placed in the Counter Shop effective
October 17, 2005 for an "undetermined" period of time. (Def.
56.1 Stmt. ¶¶ 25, 27; Ozgu Decl., Ex. R, Limited Duty Review
Board Determination dated October 14, 2005.)

Less than three months into plaintiff's assignment at
the Counter Shop, Robert Butler ("Butler"), plaintiff's
supervisor at the Counter Shop, sent an e-mail on January 11,
2006[11] to various members of the Review Board.[12] (Def. 56.1 Stmt.
¶ 28; Ozgu Decl., Ex. S, E-mail dated January 11, 2006 ("Butler
e-mail").) Butler reported in the e-mail that plaintiff had

---

[11]    Plaintiff notes that Butler "is an individual who has not provided a
declaration in this matter and who is unavailable to substantiate any of his
alleged comments," and therefore, "requests that the Court ignore all
documentation and allegations solely based upon Mr. Butler's personal
knowledge." (Pl. 56.1 Stmt. ¶ 50 n.1.) In essence, plaintiff argues that
all evidence based on Butler's statements amount to inadmissible hearsay.
Because the Butler e-mail is offered not for its truth, but rather to
demonstrate the motivations and "state of mind" of the Review Board members
at the time they made their decision to terminate plaintiff's Limited Duty
Assignment in the Counter Shop, the Butler e-mail is not hearsay and is
therefore admissible evidence properly before the court on this motion for
summary judgment. See Fed. R. Evid. 801.

[12]    Specifically, Butler's 1/11/2006 e-mail was sent to Melita Jones,
Supervisor for the Intersection Control Unit, Veronica Hyatt, Direction of
Administration for Signals and Street Lighting, Ernest Athanailos, Director
of Intelligent Transportation Systems, Alan Borock, Director of Signals and
Street Lighting and Valerie Coleman. (See Def. 56.1 Stmt. ¶ 28; Butler e-
mail.)

"stated to [Butler] that [plaintiff] has a debilitation which both interferes with and limits [plaintiff's] overall physical performance." (Def. 56.1 Stmt. ¶ 28; Butler e-mail.) Butler also stated in the e-mail that in his capacity as supervisor, he "personally observed either [plaintiff's] inability, or [plaintiff's] reluctance, in carrying out certain critical tasks while [plaintiff] was a member of several highway operational work crews." (Id.) Butler explained that he had been accommodating plaintiff by assigning plaintiff to "less than physically taxing assignments," but that in Butler's opinion, "while [plaintiff is] experiencing his current physical and subsequent emotional conditions, both the Department and this Work Unit would best be served by having [plaintiff] reassigned to another Work Unit." (Def. 56.1 Stmt. ¶ 28; Butler e-mail.)

On February 23, 2006, the Review Board determined that plaintiff's failure to "perform the tasks required of [his] limited duty assignment" required plaintiff's Limited Duty Assignment in the Counter Shop to terminate effective March 3, 2006. (Def. 56.1 Stmt. ¶ 29; Ozgu Decl., Ex. T, Limited Duty Review Board Determination dated February 23, 2006.) At that time, the Review Board noted that no other Limited Duty Assignments were available for plaintiff, and therefore, the Review Board determined that, effective March 3, 2006, plaintiff would be placed on unpaid leave pending his assignment to

another limited duty position.  (Ozgu Decl., Ex. T; Pl. 56.1
Stmt. ¶ 52; Coleman Decl. ¶ 22.)

## F. Plaintiff's Temporary Assignment in the Interior Meter Repair Section of the Meter Maintenance Unit[13] and Additional Limited Duty Assignment Requests

According to defendants, in search of an appropriate
assignment for plaintiff, Coleman contacted various divisions to
determine whether another Limited Duty Assignment might be
available for plaintiff in light of his "physical limitations."
(Def. 56.1 Stmt. ¶ 30; Coleman Decl. ¶ 23.)  Despite the DOT
policy requiring that, prior to the Review Board's approval of a
Limited Duty Assignment request, the employee obtain
Certification from the employee's physician indicating that the
employee is capable of performing the tasks specific to the
requested position, without clearance from his physician
plaintiff was permitted to return to a temporary position in the
Interior Meter Repair Section of the Meter Maintenance Unit on
March 23, 2006, where plaintiff was responsible for repairing
meter mechanisms. (Def. 56.1 Stmt. ¶¶ 33, 34; Greco Decl. ¶ 8;
Coleman Decl. ¶ 25.)  According to plaintiff, the temporary
position in the Interior Meter Repair Section was "an indoor

---

[13]    Defendants refer to the temporary position as one within the "meter
maintenance unit," but do not refer to the specific location of the
assignment.  (See Def. 56.1 Stmt. ¶ 33.)  Plaintiff, however, refers to the
temporary position as at the "Interior Meter Repair Section" within the Meter
Maintenance Unit.  (See Pl. 56.1 Stmt. ¶¶ 61-62.)  Therefore, in the interest
of clarity, the court adopts plaintiff's terminology and will refer to the
"Interior Meter Repair Section."

assignment and did not require [plaintiff] to walk or lift heavy weights." (Pl. 56.1 Stmt. ¶ 62.) Moreover, plaintiff "found [the Interior Meter Repair Section] position to be well suited to his particular needs and in line with the recommendations of his physician." (Id. ¶ 63.)

Meanwhile, in response to Coleman's inquiries, on March 10, 2006, Michael Greco ("Greco"), Assistant Chief of the Meter Route Section in the Parking Division, submitted to Coleman a Tasks and Standards Sheet reflecting the tasks performed by TDMs in the Meter Route Section. (Def. 56.1 Stmt. ¶ 31; Ozgu Decl., Ex. U, Greco Memorandum to Valerie Coleman dated March 10, 2006.) Coleman forwarded the Tasks and Standards Sheet to plaintiff on March 14, 2006, along with a request that plaintiff's physician indicate which of the tasks, if any, plaintiff was capable of performing. (Def. 56.1 Stmt. ¶ 32; Ozgu Decl., Ex. V, Letter from Valerie Coleman to Plaintiff dated March 14, 2006.)

Before plaintiff had responded to Coleman's most recent request, on March 27, 2006, Greco submitted to Coleman an amended Tasks and Standards Sheet for TDMs in the Meter Route Section, which Coleman forwarded to plaintiff's physician the following day, March 28, 2006. (Def. 56.1 Stmt. ¶¶ 35, 36; Ozgu Decl., Ex. W, Memorandum from Michael Greco to Valerie Coleman dated March 27, 2006; Ozgu Decl., Ex. X, Letter from Valerie

Coleman to Dr. Isaiah Pinckney dated March 28, 2006.)

Plaintiff's physician, upon receiving the amended Tasks and

Standards Sheet, indicated that plaintiff could not perform four

of the tasks listed.[14] (Def. 56.1 Stmt. ¶ 37; Ozgu Decl., Ex. X,

Coleman Letter to Plaintiff Regarding Amended Tasks/Limited Duty

Assignment dated March 28, 2006.)

In a letter dated April 3, 2006, however, plaintiff's

physician amended his earlier response and indicated that, with

some modifications, plaintiff could perform all of the tasks

required of TDMs within the Meter Route Section. (Def. 56.1

Stmt. ¶ 38; Ozgu Decl., Ex. Y, Dr. Pinckney's Letter dated April

3, 2006 ("Pinckney Ltr.").) Specifically, Dr. Pinckney noted

that plaintiff could fully perform seven of the eleven tasks,

and that plaintiff could perform an additional three tasks if

adjustments to these task requirements were made. (Def. 56.1

Stmt. ¶ 38; Pinckney Ltr.) According to Dr. Pinckney, the

necessary adjustments included (1) changing the requirement that

plaintiff be able to lift 50 pounds of equipment to a

requirement that plaintiff be able to lift 20 pounds; (2)

changing the requirement that plaintiff be able to walk 5 miles

---

[14]     Specifically, plaintiff's physician indicated that plaintiff could not
perform the following tasks: (a) stock vehicle with mechanism cases weighing
approximately 50 pounds, (b) walk for approximately one mile intervals (total
daily average of 5 miles), and inspect parking meters by use of computer
printout sequence of patrol and/or handheld data terminal system, (c) return
unsecured DOT property to the central shop, and (d) perform snow removal in
various city owned parking fields by use of hand shovel, snow blower and/or
vehicle equipped plow. (Ozgu Decl., Ex. X.)

daily to a requirement that plaintiff be able to walk 3 miles daily; and (3) removing the requirement that plaintiff be able to use a hand shovel to remove snow in municipal lots. (Def. 56.1 Stmt. ¶ 38; Pinckney Ltr.)

Despite plaintiff's satisfaction with his temporary position in the Interior Meter Repair Section, in a letter dated May 2, 2006, Coleman stated that "[t]he Limited Duty assignment you were assigned, in Meter Maintenance, requires performance that exceeds the limitations stated by your Doctor." (Ozgu Decl., Ex. Z, Limited Duty Review Board Evaluation of Limited Duty Assignment dated May 2, 2006; Roché Decl., Ex. 18.) The letter further stated that, as a result, plaintiff was "temporarily assigned to work on the 'Mech' Shop." (Ozgu Decl., Ex. Z; Roché Decl., Ex. 18.) (emphasis in original). Plaintiff was advised by the May 2, 2006 letter to again request a new assignment in the Facilities Management Unit in the Division of Parking and submit a Certification from his physician indicating which tasks plaintiff could and could not perform. (Def. 56.1 Stmt. ¶ 39; Ozgu Decl., Ex. Z; Roché Decl., Ex. 18.)

Dr. Pinckney informed DOT by letter dated May 8, 2006, that plaintiff was able to perform all but two of the tasks required for a Limited Duty Assignment in the Facilities Management Unit in the Division of Parking. (Def. 56.1 Stmt. ¶ 41; Ozgu Decl., Ex. AA, Dr. Pinckney Letter dated May 8, 2006.)

On May 10, 2006, Dr. Pinckney submitted a certification referring DOT to the May 8, 2006 letter in order to ascertain those tasks that plaintiff could and could not perform in the Facilities Management Unit.  (Def. 56.1 Stmt. ¶ 42; Ozgu Decl., Ex. BB, Dr. Pinckney Certification dated May 10, 2006.)

### G. Plaintiff's Limited Duty Assignment in the Meter Route Section of the Meter Maintenance Unit

The Review Board granted plaintiff's request for a Limited Duty Assignment, not in the Facilities Management Unit, but rather in the Meter Route Section on May 25, 2006, and effective May 30, 2006, plaintiff was temporarily assigned to a Limited Duty Assignment in the Meter Route Section of the Meter Maintenance Unit, subject to the limitations imposed by his physician.  (Def. 56.1 Stmt. ¶¶ 43-44; Ozgu Decl., Ex. CC, Limited Duty Review Board Determination dated May 25, 2006; Ozgu Decl., Ex. DD, Coleman e-mail dated May 25, 2006.)

During June 2006, approximately a month after plaintiff began his assignment in the Meter Route Section, according to plaintiff's supervisor, Brian O'Neill ("O'Neill"), O'Neill "observed that [plaintiff's] work performance had been well below the unit average."  (Def. 56.1 Stmt. ¶ 46; Declaration of Brian O'Neill dated February 26, 2010 ("O'Neill Decl.") ¶ 5.)  Specifically, O'Neill noted that while the average number of meter inspections per individual inspector was

350 per day, plaintiff averaged only 90 per day.[15]  (Def. 56.1

Stmt. ¶ 46; O'Neill Decl. ¶ 5.)  Consequently, O'Neill met with

plaintiff and explained that plaintiff needed to increase his

productivity.  (Def. 56.1 Stmt. ¶ 6; O'Neill Decl. ¶ 6.)

According to O'Neill, plaintiff responded that plaintiff "could

not be expected to increase his productivity given his back

condition," and requested a meeting with Greco, Assistant Chief

of the Meter Route Section.  (Def. 56.1 Stmt. ¶ 6; O'Neill Decl.

¶ 6.)

On June 27, 2006, plaintiff met with Assistant Chief

Greco and Assistant Chief Ushah Hamid.[16]  (Def. 56.1 Stmt. ¶ 47;

Pl. 56.1 Stmt. ¶ 84; Greco Decl. ¶ 14.)  According to plaintiff,

at this meeting, plaintiff attempted to explain his below-

average performance by citing the difficulty of his route in the

Bronx and his limited training.  (McDonald Decl. ¶ 45.)

Subsequent to this meeting, on July 12, 2006,

plaintiff received a written warning from Greco informing

plaintiff that his performance was below average and that the

---

[15]    Plaintiff has asserted, and defendants do not dispute, that the daily
average number of meter inspections cited by O'Neill did not reflect a quota
or minimum standard required of TDMs by DOT, but was merely the average
performance of individual TDMs within the Meter Route Section.  (McDonald
Decl. ¶ 44.)  Plaintiff asserts that his below-average performance resulted
from the unique difficulties associated with his route in the Bronx and the
increased commute time it required to reach the route.  (See Id. ¶¶ 41-43.)

[16]    Although plaintiff initially denies that this meeting between
plaintiff, Hamid, and Greco ever took place (Pl. Response to Def. 56.1 Stmt.
¶ 47), in his own 56.1 Statement plaintiff concedes that the meeting took
place and describes in detail what he said to those in attendance (Pl. 56.1
Stmt. ¶ 84).

matter might be referred for disciplinary action in the event that plaintiff's performance remained the same.[17]  (Def. 56.1 Stmt. ¶ 48; Ozgu Decl., Ex. EE, Written Warning to Plaintiff dated July 12, 2006.)

## H. Termination of Plaintiff's Meter Route Section Limited Duty Assignment

That same day, July 12, 2006, the Review Board determined that plaintiff's Limited Duty Assignment in the Meter Route Section would be concluded effective July 24, 2006, citing the fact that plaintiff's "productivity [was] far below average."  (See Def. 56.1 Stmt. ¶ 49; Roché Decl., Ex. 25, Limited Duty Review Board Determination dated July 12, 2006.) The notice to plaintiff also required plaintiff to report to the Personnel Office in the event that plaintiff was capable of returning to full duty or to notify that office if he was unable to do so.  (Def. 56.1 Stmt. ¶ 49; Roché Decl., Ex. 25.)

Following the termination of plaintiff's Limited Duty Assignment on July 24, 2006, plaintiff did not return to work. (Def. 56.1 Stmt. ¶ 50; Pl. 56.1 Stmt. ¶ 88.)  Plaintiff asserts that following the termination of his Limited Duty Assignment in

---

[17]     In this warning to plaintiff of the potential consequences of failing to increase his performance, Greco misconstrues Dr. Pinckney's certification as having authorized plaintiff to perform all duties required in the Meter Route Section "without limit."  (Ozgu Decl. Ex. EE.)  As discussed *supra* at pages 18-19, Dr. Pinckney's letter dated April 3, 2006 described the extent to which plaintiff's ability to perform the duties required of TDMs within the Meter Route Section was limited.  (See Pinckney Ltr.)

the Meter Route Section, without an assignment to report to, he did not return to work and was "wait[ing] for Defendant to get back to him regarding his last Limited Duty Request, which was for [Facilities Management Unit], and which his doctor had approved."  (Pl. 56.1 Stmt. ¶¶ 88, 90.)

In light of plaintiff's unexcused absences, however, beginning on July 24, 2006, defendants allege that plaintiff's supervisors exhausted his leave balances, including compensatory time, sick time and annual leave.  (Def. 56.1 Stmt. ¶ 50; Greco Decl. ¶ 17; O'Neill Decl. ¶ 10.)  On August 11, 2006, Philip Galgan, Supervisor of TDMs, sent plaintiff a letter informing plaintiff of his unauthorized absence, and advising that continued unapproved absence would jeopardize plaintiff's employment with DOT.  (Def. 56.1 Stmt. ¶ 51; Ozgu Decl., Ex. GG, Philip Galgan Letter dated August 11, 2006 ("Galgan Ltr.").) The letter further informed plaintiff that failure to inform DOT of plaintiff's intentions would result in formal disciplinary proceedings and possibly plaintiff's suspension or termination. (Galgan Ltr.)  The letter also contained a Leave Request Form, Federal Medical Leave Act Request Form, and a Resignation Form. (Id.)

## I. Plaintiff's Complaints to NYSDHR and Retirement from DOT

Approximately one month and one half after the July 24, 2006 termination of plaintiff's Limited Duty Assignment in

the Meter Route Section, plaintiff filed a discrimination charge with the New York State Division of Human Rights ("NYSDHR") on September 6, 2006 alleging discrimination by DOT based on plaintiff's disability.  (Def. 56.1 Stmt. ¶ 53; Ozgu Decl., Ex. HH, Plaintiff's Verified Complaint to the SDHR, dated September 6, 2006.)

By letter dated October 10, 2006, DOT charged plaintiff with being absent without leave ("AWOL") for more than twenty workdays and advised plaintiff that the DOT advocate had been apprised of his AWOL status and would schedule a hearing to terminate plaintiff's employment with DOT.  (Def. 56.1 Stmt. ¶ 54; Ozgu Decl., Ex. II, Letter of Jean Frankowski dated October 10, 2006.)  The letter further directed plaintiff to submit documentation justifying his AWOL status to DOT's Office of the Advocate prior to returning to duty.  (Def. 56.1 Stmt. ¶ 55; Ozgu Decl., Ex. II.)  Defendants allege that plaintiff did not respond to the AWOL notice and DOT continued to deem his absences unauthorized.  (Def. 56.1 Stmt. ¶ 56; Ozgu Decl., Ex. JJ, Plaintiff's Leave Inquiry between July 21, 2006 and November 1, 2007.)

On December 4, 2006, plaintiff then filed a second claim with the NYSDHR, this time alleging retaliation.  (Def. 56.1 Stmt. ¶ 57; Ozgu Decl., Ex. KK, Plaintiff's Verified Complaint to the NYSDHR, dated December 4, 2006.)  Pursuant to

Section 72 of the Civil Service Law,[18] DOT sent plaintiff to Dr.

Brief, a medical doctor appointed by the City, in order to

determine plaintiff's fitness for duty.  (Def. 56.1 Stmt. ¶ 58;

Pl. 56.1 Stmt. ¶ 99.)  Upon examining plaintiff on December 8,

2006, Dr. Brief concluded that plaintiff was "medically not fit

to perform his duties as a traffic device maintainer."  (Def.

56.1 Stmt. ¶ 59; Pl. 56.1 Stmt. ¶ 99; Ozgu Decl., Ex. LL, Dr.

Brief's Letter dated December 11, 2006 ("Dr. Brief Ltr.").)

Consequently, on December 12, 2006, DOT informed plaintiff that

based upon Dr. Brief's findings, DOT proposed to place plaintiff

on a leave of absence pursuant to Civil Service Law Section 72.

(Def. 56.1 Stmt. ¶ 60; Ozgu Decl., Ex. MM, Letter of Erica

Caraway to plaintiff dated December 12, 2006.)  Ultimately, on

January 5, 2007, DOT placed plaintiff on a leave of absence.

---

[18]     New York Civil Service Law § 72 provides, in relevant part:

> When in the judgment of an appointing authority an employee
> is unable to perform the duties of his or her position by reason
> of a disability . . . the appointing authority may require such
> employee to undergo a medical examination to be conducted by a
> medical officer selected by the civil service department or
> municipal commission having jurisdiction . . . .  If, upon such
> medical examination, such medical officer shall certify that such
> employee is not physically or mentally fit to perform the duties
> of his or her position, the appointing authority shall notify
> such employee that he or she may be placed on leave of absence .
> . . .  An employee on such leave of absence shall be entitled to
> draw all accumulated, unused sick leave, vacation, overtime and
> other time allowances standing to his or her credit . . . .  If
> an employee placed on leave pursuant to this section is not
> reinstated within one year after the date of commencement of such
> leave, his or her employment status may be terminated in
> accordance with the provisions of section seventy-three of this
> article . . . .

N.Y. Civ. Serv. L. § 72.

(Def. 56.1 Stmt. ¶ 62; Ozgu Decl., Ex. NN, Letter of Erica Caraway to plaintiff dated January 5, 2007.)

On July 31, 2007, plaintiff requested to file for ordinary disability retirement. (Def. 56.1 Stmt. ¶ 63; Ozgu Decl., Ex. OO, Letter of Dianne D'Alessandro, Executive Director of New York City Employees' Retirement System ("NYCERS") to plaintiff dated February 15, 2008 ("NYCERS Ltr.") (noting request filed July 31, 2007).) In a letter dated February 15, 2008, the Board of Trustees of NYCERS granted plaintiff's requested disability retirement retroactively effective August 30, 2007.[19] (NYCERS Ltr.)

With respect to plaintiff's claim of discrimination based on disability, NYSDHR issued an order on January 16, 2008, dismissing the complaint and finding that there was no probable cause to believe that DOT engaged in discrimination against plaintiff. (Ozgu Decl., Ex. PP, NYSDHR Determination and Order After Investigation, case no. 10113702.) Crucial to NYSDHR's determination was its finding that plaintiff "failed to show that he was able to perform the essential functions of a TDM as that position is defined by his employer, or that his employer

---

[19] On January 9, 2008, while plaintiff's request for disability retirement was pending, DOT terminated plaintiff pursuant to section 72 of the New York Civil Service Law. (Roché Decl., Ex. 32, Letter of Erica Caraway to Plaintiff regarding Plaintiff's Termination of Employment dated January 9, 2008.) It appears, however, that NYCERS' approval of plaintiff's disability retirement request on February 15, 2008 served to supersede plaintiff's January 9, 2008 termination.

has failed to provide a reasonable accommodation that would allow him to carry out those functions."  (Id.)

Similarly, on the same day, January 16, 2008, NYSDHR issued an order dismissing plaintiff's retaliation complaint on grounds that there was no probable cause because insufficient evidence existed "to establish a causal nexus between Complainant's treatment by Respondent and his action of having filed a disability discrimination case with the Division." (Ozgu Decl., Ex. QQ, SDHR Determination and Order After Investigation dated January 16, 2008.)

## J. Procedural Posture

On March 10, 2008, the EEOC issued to plaintiff a right to sue letter.  (Ozgu Decl., Ex. RR, Plaintiff's EEOC Right to Sue Letter dated March 10, 2008.)  Plaintiff then commenced the present federal action against defendants on June 10, 2008 alleging employment discrimination on the basis of his disability, failure to accommodate his disability, and retaliation against plaintiff for filing his filing a charge of disability discrimination with NYSDHR, all in violation of the ADA, as amended, 42 U.S.C. §§ 1201 *et seq*.  (See generally Compl. at 1.)

**DISCUSSION**

**I. Standard of Review on Summary Judgment Motion**

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks and citation omitted). "A fact is 'material' for these purposes when it might affect the outcome of the suit under governing law." Id. (internal quotation marks and citation omitted). Thus, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Further, a reviewing court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party.  <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir. 2001).  Nevertheless, the nonmoving party cannot rest merely on allegations or denials but must instead set out specific facts showing a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(c) and 56(e); <u>see also</u> <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.").  Nor can the nonmoving party rest only on the pleadings.  <u>Celotex</u>, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings.").  Instead, each statement of material fact by the movant or opponent must be followed by citation to admissible evidence.  <u>See</u> Fed. R. Civ. P. 56(c) and 56(e); Local Civil Rule 56.1(d).

Thus, in deciding a motion for summary judgment, the court's task is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. <u>Anderson</u>, 477 U.S. at 249.

## II.    Application

Plaintiff alleges that because of his disability, namely his herniated disc in his cervical-lumbar areas, DOT violated the ADA by discriminating against him, failing to promote him, failing to provide a reasonable accommodation, and retaliating against him for registering a discrimination charge with the New York State Division of Human Rights.[20]  (See Compl. ¶¶ 4, 7, 8E, 9.)  Further, plaintiff claims that defendants' actions violated the New York State and City Human Rights Laws. (See id. at 2.)  Each claim will be discussed in turn.

### A. The ADA Claims

The ADA prohibits discrimination against qualified individuals by public entities, such as the DOT, on the basis of the disability of such an individual "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination in violation of the ADA also includes, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); see

---

[20]    As discussed further infra, by failing to respond to defendants' motion for summary judgment on his failure to promote and retaliation claims, plaintiff appears to have abandoned or withdrawn those claims.  Nonetheless, the court will consider each of those claims in turn.

also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134-35 (2d Cir. 2008).

In analyzing discrimination claims under the ADA, the Second Circuit applies the familiar burden-shifting test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009); Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Prog., Inc., 198 F.3d 68, 72 (2d Cir. 1999). Thus, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. Id. (citation omitted). "The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action." Id. (citation omitted). Finally, the burden shifts back to the plaintiff who must then "show that the proffered reason was merely a pretext for discrimination." Id. (citation omitted). This showing may be made "either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." Id. (internal quotations and citations omitted).

### 1. Disability Discrimination, Failure to Promote, & Failure to Provide Reasonable Accommodation Claims

Of course, for any ADA discrimination claim, in order for a qualified individual to establish a *prima facie* case and invoke the protections against discrimination under the ADA, a person must be an "individual with a disability" within the meaning of the Act. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 216 (2d Cir. 2001); see also Schaeffer v. State Ins. Fund, 207 F.3d 139, 142 (2d Cir. 2000) ("In order to make out a *prima facie* case under the ADA, the plaintiff must prove, *inter alia*, discrimination by a preponderance of the evidence. As one element of the *prima facie* case . . . plaintiff must show that she has a 'disability' within the meaning of the ADA.") (internal citation omitted). Here, defendants move for summary judgment on a host of grounds, including that plaintiff cannot establish a *prima facie* case of discrimination because, *inter alia*, plaintiff cannot show that he had a "diability" within the meaning of the ADA. The court considers this threshold inquiry of whether plaintiff can show that he has a "disability" under the ADA.

### a. Whether Plaintiff Has a Disability

The term "disability" is defined in the ADA as:

(A)  a physical or mental impairment that substantially limits one or more major life activities of [an] individual;

(B)  a record of such an impairment; or
(C)  being regarded as having such an impairment.

42 U.S.C. § 12102(1).  Here, plaintiff does not allege having a
record of a disabling impairment (see Pl. Mem. at 8-10), so the
question is whether plaintiff can show that he had an actual
disability in the form of "a physical or mental impairment that
substantially limits one or more major life activities" or
whether he can show that DOT regarded him as having such an
impairment, see 42 U.S.C. § 12102(2)(A), (C).  In his opposition
to defendants' motion, plaintiff does not raise a genuine issue
of material fact on either ground.

### i.  Physical or Mental Impairment Substantially Limiting Major Life Activities

Notably, not every physical or mental impairment
serves to establish an actual disability under the ADA.  Rather,
only those impairments that "limit a major life activity" in a
"substantial" manner are statutorily recognized disabilities.
Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005)
(citing 42 U.S.C. § 12102(2)(A)).  "The ADA's requirement that,
in order to constitute a disability under its terms, an
impairment must substantially limit a major life activity
underscores that the impairment must be significant, and not
merely trivial."  Reeves v. Johnson Controls World Servs., 140
F.3d 144, 151 (2d Cir. 1998) (citation omitted) (emphasis

omitted).  Further, whether an impairment limits a major life activity in a substantial manner must be determined on a "case-by-case" basis.  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).

Thus, to determine whether a plaintiff makes a showing of actual disability and meets the first definition of a disability under the ADA, the Supreme Court has established a three-step inquiry.  See Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  First, the court must determine whether the individual suffers from a "physical or mental impairment"; second, the court must determine whether the life activity on which the individual relies amounts to a "major" life activity; and third, the court must determine whether the specified impairment "substantially limits" that major life activity.  Id.  In conducting this analysis, the law of this Circuit holds that the regulations interpreting the term "disability" by the Equal Employment Opportunity Commission ("EEOC"), the agency with principal responsibility for the enforcement of the ADA, are "entitled to great deference."  Bartlett v. New York State Bd. of Law Examiners, 226 F.3d 69, 79 (2d Cir. 1998).

### 1)    Physical or Mental Impairment

The first issue is whether plaintiff suffers from a physical or mental impairment.  Bragdon, 524 U.S. at 631.  The

EEOC has defined a "physical or mental impairment" under the ADA as:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h)(1). As clear from this definition, and as undisputed by the parties, plaintiff's herniated disc in the cervical and lumbar areas constitutes a physical "impairment" within the meaning of the ADA.

### 2) Major Life Activities

The second issue is whether plaintiff's impairment substantially limits one or more "major life activities." Bragdon, 524 U.S. at 631. Under the EEOC regulations, the term "major life activities" is defined to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). These listed activities are considered major life activities "*per se*," but the list "is meant to be illustrative and not exclusive." Reeves, 140 F.3d at 150, 152. Thus, the Second Circuit has also explicitly held that the term "major life activities" as defined in the ADA includes "working," Bartlett, 226 F.3d at 80, and the Circuit has assumed, without

deciding, that standing, sitting, lifting, and bending are also major life activities under the ADA, Colwell v. Suffolk Co. Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998); see also Ryan v. Grae & Rybicki, 135 F.3d 867, 870 (2d Cir. 1998).

Here, plaintiff alleges that his impairment has substantially limited his major life activities of walking, standing, sitting, lifting, and bending.  (Id. at 8.)  Further, and primarily, plaintiff alleges that his "cervical and lumbar herniations" substantially limit his ability to perform the major life activity of "working."  (See Pl. Mem. at 8-10.) Thus, as set forth above, plaintiff has established that each of his affected activities – walking, standing, sitting, lifting, bending, and working – meets the definition of a "major life activity" under the ADA for purposes of this motion.  See Bartlett, 226 F.3d at 80; see also Colwell, 158 F.3d at 643.

### 3) Substantial Limitation

Having determined that plaintiff has established the existence of an impairment, the question remains whether the impairment "substantially limits," rather than merely affects, these identified life activities which are deemed to be "major" under the ADA.  See Colwell, 158 F.3d at 643 (internal citations omitted); see also Bragdon, 524 U.S. at 631.  The EEOC has defined "substantially limits" under the ADA to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Further, the EEOC has set forth factors that may be considered in determining whether an individual is "substantially" limited in a major life activity including:

> (i)   The nature and severity of the impairment;
> (ii)  The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). Critical to this analysis is consideration of "'the nature and severity of the impairment' as compared with the "average person's ability to perform those activities." See Colwell, 158 F.3d at 644 (citing 29 C.F.R. § 1630.2(j)(2)). Applying these standards, plaintiff fails to raise a genuine issue of material fact on the issue of whether his impairment substantially limits any of the identified major life activities.

First, with respect to walking and standing, plaintiff alleges that this major life activity is substantially limited because he cannot walk or stand "for prolonged periods of time."

(Pl. Mem. at 8.)  Yet the record indicates that plaintiff's
doctor, Dr. Pinckney, cleared plaintiff to walk up to three
miles per day on a limited duty assignment in the Meter Route
Section.  (Def. 56.1 Stmt. ¶ 38; Pinckney Ltr.)  Further,
plaintiff testified that his injury does not prevent him from
walking or standing at all, but that he is unable to walk or
stand "for long periods of time" and is limited in his ability
"to do things in a quick manner."  (Pl. Dep. at 79-81.)
Plaintiff further testified that his cervical herniations do not
always affect his ability to walk and stand, and that the impact
on his walking "varies" and that he "can't say" how often his
injury affects his ability to stand.  (Id. at 80-81.)  These
vague and ambiguous descriptions by plaintiff of his
limitations, coupled with the record evidence that plaintiff was
cleared by his doctor to walk up to three miles per day cannot
support a finding by a rational factfinder that plaintiff was
substantially limited in the major life activities of walking or
standing.  See Colwell, 158 F.3d at 644 (difficulty standing
"for a long period of time" insufficient to support conclusion
that plaintiff is "substantially impaired in his ability to
stand . . . as compared with the average person") (quotation and
citation omitted); see also Piascyk v. City of New Haven, 64 F.
Supp. 2d 19, 28-29 (D. Conn. 1999) (finding plaintiff's ability
to walk a half mile indicated that he "was not significantly

restricted in his ability to walk 'as compared to . . . the average person in the general population'") (quoting 29 C.F.R. § 1630(2)(j)(1)(ii)); see also id. (collecting cases rejecting finding of substantial limitation on ability to walk); see also id. (finding vague testimony that plaintiff was "limited in his ability to endure 'prolonged standing'" too ambiguous to support a finding of substantial limitation).

Second, with respect to sitting, plaintiff alleges that he cannot sit "for prolonged periods of time" which renders him substantially limited in this major life activity. (Pl. Mem. at 8.) Plaintiff does not offer any further delineation on how his impairment affects his ability to sit. Even aside from the fact that plaintiff's allegations are vague and ambiguous, courts have held that the inability to sit for a "prolonged" period does not constitute a disability within the meaning of the ADA. See Colwell, 158 F.3d at 644 (inability to sit "too long" and for "prolonged" periods for one plaintiff and inability to sit "for long periods of time" for another plaintiff both insufficient to establish substantial limitation on ability to sit); see also Piascyk, 64 F. Supp. 2d at 29 (finding plaintiff's testimony that he could not sit for "long periods of time" "too vague to establish a substantial limitation"), id. (collecting cases); Kirkendall v. United Parcel Service, Inc., 964 F. Supp. 106, 111 (W.D.N.Y. 1997)

(inability to sit for more than three hours at a time did not render plaintiff disabled under ADA) (citing Wernick v. Federal Reserve Bank of New York, No. No. 93 Civ. 2606 (KTD), 1995 WL 598973, at *1, *3 (S.D.N.Y. Oct. 10, 1995) (finding restriction that plaintiff cannot sit for "prolonged" period did not render her disabled under ADA and did not substantially limit any major life activity, including ability to work)).

Third, with respect to lifting, plaintiff alleges that he is substantially limited in this activity because he "cannot lift weights exceeding 20 [pounds]." (Pl. Mem. at 8.) Numerous courts have held, however, as a matter of law, that the weight limitation similar to that claimed by plaintiff is insufficient to establish a substantial limitation on one's ability to lift, work, or perform any other major life activity. See Colwell, 158 F.3d at 639, 644 (two plaintiffs' inability to lift "very heavy objects" or "anything heavy," respectively, insufficient to establish substantial limitation on ability to lift as compared to the average person); see also Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997) ("general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA"); Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996) (same, for twenty-five pound lifting limitation); Aucutt v. Six Flags, Over Mid-America,

Inc., 85 F.3d 1311, 1319 (8th Cir. 1996) (same, for twenty-five pound lifting restriction); Piascyk, 64 F. Supp. 2d at 29-30 (same, for fifteen pound lifting restriction), id. (collecting cases); Gittens v. Garlocks Sealing Technols., 19 F. Supp. 2d 104, 111 (W.D.N.Y. 1998) (same, for thirty pound lifting restriction); Zarzycki v. United Technols. Corp., 30 F. Supp. 2d 283, 289 (D. Conn. 1998) (same, for inability to hold "heavy weight"); Kirkendall, 964 F. Supp. at 111 (same, for thirty pound lifting restriction).

Fourth, plaintiff alleges substantial limitation in a major life activity because he is "limited in his ability to bend at the waist without causing himself pain." (Pl. Mem. at 8.) Specifically, plaintiff claims that he cannot bend completely, "as much as what somebody else may be able to do" and cannot "touch [his] toes or bend down to like a 90-degree angle." (Pl. Dep. at 83-84.) This evidence is insufficient to allow any reasonable juror to conclude that plaintiff is "substantially" impaired in his ability to bend as compared with the average person. See Colwell, 158 F.3d at 639, 644 (inability to bend over "for long periods" insufficient to show substantial impairment of major life activity of bending); see also Piascyk, 64 F. Supp. 2d at 31 (evidence that plaintiff has "some limitation of motion with forward bending and side to side" insufficient to support finding by a reasonable jury that

plaintiff was substantially limited in his ability to bend), id.
(collecting cases).

Finally, with respect to working, to show substantial
limitation in this activity under the ADA a plaintiff must prove
that he is "significantly restricted in the ability to perform
either a class of jobs or a broad range of jobs in various
classes as compared to the average person having comparable
training, skills, and abilities.  The inability to perform a
single, particular job does not constitute a substantial
limitation in the major life activity of working."  29 C.F.R. §
1630.2(j)(3)(i).  Further, "[a]n impairment that disqualifies a
person from only a narrow range of jobs is not considered a
substantially limiting one."  See Muller v. Costello, 187 F.3d
298, 313 (2d Cir. 1999) (quotation and citation omitted).

In determining whether an individual is significantly
restricted in the ability to perform a class of jobs or a broad
range of jobs in various classes, a court may consider: (1) "the
geographical area to which the individual has reasonable
access"; (2) "the job from which the individual has been
disqualified because of an impairment, and the number and types
of jobs utilizing similar training, knowledge, skills or
abilities, within that geographical area, from which the
individual is also disqualified because of the impairment (class
of jobs)"; and/or (3) "the job from which the individual has

been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes)."  29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C).

Here, beyond unsupported conclusory allegations insufficient to defeat summary judgment, plaintiff makes no attempt to show that his impairment significantly restricts his ability to perform a class of jobs or a broad range of jobs in various classes.  See id.; see also Defabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 81 (2d Cir. 2010) (nonmoving party must "must do more than simply show that there is some metaphysical doubt as to the material facts, . . . and [he] may not rely on conclusory allegations or unsubstantiated speculation") (internal quotations and citations omitted). Thus, plaintiff merely alleges conclusorily that he was "substantially limited . . . in his ability to perform an entire class of jobs at [DOT]."  (Pl. Mem. at 9.)  Yet plaintiff has presented no evidence to suggest that he would be disqualified from performing the essential functions of any job other than his particular, pre-injury position as a TDM.  (See Dr. Brief Ltr. (finding upon medical examination that plaintiff was

"medically not fit to perform" the specific duties for his job "as a traffic device maintainer").)

Rather, both the record and plaintiff's own arguments reflect that plaintiff was capable of performing other jobs at DOT including, specifically, the temporary job to which plaintiff was assigned in the Interior Meter Repair Section, which plaintiff found "well suited to his particular needs and in line with the recommendations of his physician. . . ." (See Pl. 56.1 Stmt. ¶ 63.) This record precludes any inference that plaintiff's impairment significantly limited plaintiff's ability to perform a class of jobs or a broad range of jobs in various classes. See, e.g., Young v. Precision Metal Prods., Inc., 599 F. Supp. 2d 216, 225-26 (D. Conn. 2009) (finding plaintiff's ability to maintain a fulltime job that is apparently similar to his previous job to undermine the argument that plaintiff is significantly restricted in working); see also Ongsiako v. City of New York, 199 F. Supp. 2d 180, 185-86 (S.D.N.Y. 2002) (finding absence of evidence "from which a rational juror could infer that [plaintiff's] impairment precluded him from performing a broad class of jobs" where evidence in light most favorable to plaintiff "leads to only one rational inference: plaintiff's back impairment . . . prevented him only from working as a City construction laborer or in other jobs for which heavy lifting was an essential function"); Gittens, 19 F.

Supp. 2d at 111 (granting summary judgment and finding that plaintiff has "failed to plead that he has a disability within the meaning of the ADA" where "plaintiff has not been limited from employment in general, and in fact has remained employed by defendant").

Further, plaintiff has submitted no evidence of his vocational training, geographical area to which he has access, or the number or types of jobs demanding or not demanding similar training from which a rational juror could conclude that he would be disqualified. Plaintiff's conclusory allegations are thus plainly insufficient to defeat summary judgment. See Muller, 187 F.3d at 313 (finding evidence of "a limitation on a single, particular job cannot constitute a substantial limitation of the major life activity of working" where plaintiff failed to present any evidence that he was "precluded from jobs other than correctional officer in his geographic area"); see also Young, 599 F. Supp. 2d at 225 (D. Conn. 2009) (finding plaintiff "not substantially limited in the major life activity of working" where plaintiff failed to offer "evidence to show he is, or ever was, significantly restricted in the ability to perform either a class of jobs or a broad range of jobs"); Piascyk, 64 F. Supp. 2d at 32 (finding plaintiff failed to meet his burden where plaintiff "presented no evidence

whatsoever concerning the kinds of jobs from which he is disqualified").

Moreover, interpreted in the light most favorable to plaintiff, plaintiff's evidence of some restrictions on his abilities to walk, stand, sit, lift, and bend together do not constitute a substantial limitation on the major life activity of working as compared to the average person having comparable "training, skills, and abilities." See Colwell, 158 F.3d at 644-45 (finding evidence consisting of "general restrictions imposed by doctor" insufficient to show that plaintiff was "significantly restricted" in his ability "to work at a class or broad range of jobs" and further finding second plaintiff's physical "limitations at work" do not restrict plaintiff's "'ability to perform either a class of jobs or a broad range of jobs . . . as compared to the average person having comparable training, skills and abilities'") (quoting 29 C.F.R. § 1630.2(j)(3)(i)); see also Piascyk, 64 F. Supp. 2d at 32 (finding evidence of plaintiff's restrictions on walking, standing, sitting, bending, and lifting would not "support a rational conclusion that [plaintiff] was unable to perform the requirements of even a single job, let alone a class or broad range of jobs").

Thus, the evidence establishes without genuine dispute that plaintiff's cervical herniations have not "substantially

limited" his ability to work.  Because plaintiff has thus failed

to raise a genuine issue of material fact as to whether he was

"substantially" limited in the major life activities of walking,

standing, sitting, lifting, bending, or working, plaintiff

cannot establish that he was actually "disabled" for purposes of

the ADA.  See 42 U.S.C. § 12102(2)(A).

### b. Whether Plaintiff Was "Regarded as" Having a Disability

An employee who is unable to make a *prima facie*

showing of actual disability may nonetheless establish

"disability" under the ADA through proof that he was subjected

to an adverse employment action because the DOT "regarded" him

as disabled within the meaning of the ADA.  See 42 U.S.C. §§

12102(2)(C).  The Second Circuit has instructed that the

"decisive issue" on a "regarded as disabled" claim under 42

U.S.C. § 12102(1)(C) "is the employer's *perception* of his or her

employee's alleged impairment."  See Giordano v. City of New

York, 274 F.3d 740, 748 (2d Cir. 2001) (citing Colwell, 158 F.3d

at 646) (emphasis in original).  Thus, a plaintiff proceeding

under this section must "show not only that the defendants

'regarded him as somehow disabled,' but that they 'regarded him

as disabled *within the meaning of the ADA*.'"  Id. (quoting

Colwell, 158 F.3d at 646) (emphasis in original) (additional

alterations omitted).  Accordingly here, to establish a

"regarded as" claim under 42 U.S.C. § 12102(1)(C), plaintiff must establish that the defendants perceived him as substantially limited in his ability to perform the major life activities of walking, standing, sitting, lifting, bending, and/or working. See id.; see also Colwell, 158 F.3d at 647 ("To prove that they were regarded as substantially limited in their ability to work, [plaintiffs] bore the burden of proving that the [employer] perceived them to be incapable of working in a broad range of jobs suitable for persons of their age, experience, and training.") (internal quotations, alterations, and citation omitted). Plaintiff cannot raise a genuine issue of material fact to meet this burden.

Plaintiff claims that he was "regarded as" disabled by DOT, and notes that DOT's own physician, Dr. Brief, stated that plaintiff's spine has a "severe discogenic injury," and that plaintiff is "medically not fit to perform his duties" as a TDM. (See Pl. Mem. at 9; see also Dr. Brief Ltr.) Yet even assuming that this letter expresses the views of defendants, as expressly stated by Dr. Brief's letter, the letter itself supports the notion that defendants did not perceive plaintiff as "substantially limited" in the major life activity of working, but rather viewed plaintiff as limited in the specific activity of performing the particularized duties of his former job as a TDM. Here, just as in Giorando, "the record contains no

evidence from which [the court] can infer that the defendants thought, or had grounds for thinking," that plaintiff's impairment disqualified him from jobs in the public or private sector" such that he would be "substantially" limited in the life activity of working.  See Giordano, 274 F.3d at 749 (finding plaintiff to have "introduced evidence that establishes at most that the defendants regarded him as disabled from police or other investigative or security jobs that involve a substantial risk of physical confrontation").  Moreover, the Second Circuit has found that a light duty assignment such as plaintiff's, does not in and of itself indicate that an employer regards an employee as disabled within the meaning of the ADA. See Colwell, 158 F.3d at 647 ("[a]ssignment to light duty status . . . does not support the inference that [employer] regarded [plaintiffs] as disabled").  Absent any admissible evidence from which a rational trier of fact might conclude that defendants "regarded" plaintiff as disabled within the meaning of the ADA, plaintiff fails to raise a genuine issue of material fact on this issue.

Having failed to show that he suffers from a physical impairment which substantially limits a major life activity or that the DOT regarded him has possessing such an impairment, no rational jury could conclude that plaintiff is disabled within the meaning of the ADA.  Because plaintiff cannot show that he

is disabled within the meaning of the ADA, plaintiff cannot meet his burden to establish a *prima facie* case under the burden-shifting test as required for his ADA claims of discrimination, discriminatory failure to promote, and discriminatory failure to accommodate.  See Heyman, 198 F.3d at 72 (*prima facie* case of discrimination under the ADA requires showing "that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability") (citation omitted); see also Brower v. Continental Airlines, Inc., 62 F. Supp. 2d 896, 905 (E.D.N.Y. 1999) (*prima facie* case of a discriminatory failure to promote under the ADA requires showing by plaintiff "(1) that she was disabled under the ADA,; (2) that she applied for positions for which she was qualified; (3) that she was not promoted; and (4) failure to promote was under circumstances giving rise to an inference of discrimination"); Lovejoy-Wilson, 263 F.3d at 221 (describing *prima facie* case for ADA failure to promote claim); McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96-97 (2d Cir. 2009) ("*prima facie* case of disability discrimination arising from a failure to accommodate" established by showing: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of

his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations") (internal quotation omitted).

Thus, because no rational jury could conclude that plaintiff was "disabled" and able to establish a *prima facie* case of discrimination under the ADA, plaintiff's claims under the ADA of disability discrimination, failure to promote, and failure to provide a reasonable accommodation, cannot survive summary judgment. Therefore, the court need not address the merits of defendants' remaining arguments for summary judgment as to the plaintiff's claims of discrimination, failure to promote, and failure to provide reasonable accomodation.

### 2.    Retaliation Claim

The ADA also makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). For retaliation claims under the ADA, courts employ the same burden-shifting analysis used for discrimination claims. See Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999) (citation omitted).

Thus, to establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of the activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action."  Id.  (quotation and citation omitted). Notably, under the first element, the Second Circuit has held that a "plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  Id. (quotation and citation omitted).  Once a plaintiff has established a *prima facie* case of retaliation, a presumption of retaliation arises and the burden shifts to defendants to show that the alleged adverse employment action was taken for legitimate, non-retaliatory reasons.  See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  Finally, "once an employer offers such proof," the burden shifts back to plaintiff who has the ultimate burden of showing that the proffered reasons are a pretext for retaliation.  Id.

Here, plaintiff asserted a claim of retaliation in his complaint, but in his opposition failed to address defendants' arguments for summary judgment on his retaliation claim by

offering legal argument or evidentiary support.  (*See generally* Pl. Mem. and supporting documents.)  By neglecting to respond to defendants' arguments in his opposition, it therefore appears that plaintiff has withdrawn or abandoned this claim making it ripe for dismissal.  See *Arias v. NASDAQ/AMEX Mkt. Group,* No. 00-CV-9827 (MBM),  2003 U.S. Dist. LEXIS 166, at *34 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); see also Local Civ. Rule 7.1 ("[A]ll oppositions [to a motion for summary judgment] shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . .  Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").  Nevertheless, in an abundance of caution, the court has considered the substance of plaintiff's retaliation claim, and finds that it must be dismissed on the merits because plaintiff fails to establish a *prima facie* case of retaliation.

Plaintiff met the first element of his *prima facie* case of retaliation because he filed complaints to the NYSDHR, unquestionably a protected activity for purposes of the ADA. Further, DOT appears to concede, and the record supports a finding that plaintiff possessed a good faith, reasonable belief

that DOT's actions violated the law.  Under the second and third elements, it is undisputed that DOT was aware of plaintiff's complaints, and that plaintiff was ultimately placed on one-year medical leave pursuant to Civil Service Law 72.  However, under the fourth element, plaintiff fails to raise a genuine issue of material fact as to whether a "causal connection" existed between the protected activity and the adverse employment action.

Here, plaintiff's protected activity of filing his discrimination charge with the NYSDHR on September 6, 2006 (Def. 56.1 Stmt. ¶ 53; Ozgu Decl., Ex. HH) occurred well after the Review Board's July 12, 2006 decision to terminate plaintiff's limited duty assignment effective July 24, 2006 (Def. 56.1 Stmt. ¶ 49, Roché Decl., Ex. 25), and one and a half months after plaintiff had, without authorization, stopped reporting to work on July 25, 2006 (Def. 56.1 Stmt. ¶ 50; Pl. 56.1 Stmt. ¶ 88). Further, at the time plaintiff filed the discrimination charge with the NYSDHR in September 2006, plaintiff had already received at least one letter dated August 11, 2006, which advised plaintiff that his unauthorized absences could jeopardize his continued employment with DOT and result in disciplinary proceedings.  (See Galgan Ltr.)  Yet as defendants correctly note, rather than deeming plaintiff's absences unauthorized and using the unauthorized absences as a basis for

disciplinary charges, DOT instead referred plaintiff to a doctor for a medical assessment regarding plaintiff's fitness for duty pursuant to Civil Service Law 72, resulting in a finding that plaintiff was not fit to perform his duties as a TDM. (Def. 56.1 Stmt. ¶¶ 58-59; Pl. 56.1 Stmt. 99; Ozgu Decl., Ex. LL.)

Thus, the primary adverse employment action here – the termination of plaintiff's Limited Duty Assignment – was taken well prior to plaintiff's discrimination charge, and although plaintiff's placement on Section 72 medical leave followed the filing of his discrimination charge, DOT declined, as was possible, to pursue disciplinary proceedings against plaintiff for his unexcused absences. Considering this record, under the fourth element of a *prima facie* retaliation case, plaintiff has failed to establish a causal connection between his NYSDHR charges and his termination from his Limited Duty Assignment or eventual placement on Section 72 medical leave.

Because plaintiff cannot establish a *prima facie* case of retaliation, his retaliation claim cannot survive defendants' motion for summary judgment and is hereby dismissed.

**B. State and City Disability Discrimination and Retaliation Claims**

For the first time in his opposition papers, plaintiff asserts that the reference in his Complaint to "any related claims under New York law" should be liberally construed to

contain causes of action under both the NYSHRL and the NYCHRL. (Pl. Mem. at 19-20.) In their reply, defendants seek summary judgment as to such claims arguing, *inter alia*, that to the extent the court liberally construes plaintiff's complaint to include claims under the State and City Human Rights Laws, such claims are precluded by the election of remedies provisions of those statutes. (Def. Reply Mem. at 9.) The court has assumed, without deciding, that the plaintiff asserted such claims in his Complaint. The court, however, finds that the election of remedies provisions contained in the NYSHRL bars the court's consideration of plaintiff's NYSHRL claims, and declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims.

First, the election of remedies provision contained in section 297(9) of the NYSHRL precludes NYSHRL claims that were first brought before the NYSDHR to "be brought again as a plenary action in another court." See York v. Assoc. of Bar of City of New York, 286 F.3d 122, 127 (2d Cir. 2002); see also N.Y. Exec. Law § 297(9). Unless the claims are dismissed by the NYSDHR for one of the enumerated procedural reasons,[21] the

---

[21] Section 297(9) of the NYSHRL provides:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages ... *unless such person had filed a complaint hereunder or with any local commission on human rights*, ... provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the

election of remedies provision under the NYSHRL poses an "insuperable jurisdictional bar" to subsequently raising those same claims of in federal court.  Moodie v. Fed. Reserve Bank of New York, 58 F.3d 879, 882-84 (2d Cir. 1995); see also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) ("[T]he prohibition against filing in state court after a complaint has been filed with the Division of Human Rights applies to state law claims in federal courts as well.") (citing Wiesman v. Metro. Museum of Art, 772 F. Supp. 817, 819 (S.D.N.Y. 1991)); Alston v. Microsoft Corp., No. 08-Cv-3547, 2009 WL 1116360, at *5 (S.D.N.Y. Apr. 27, 2009) ("The administrative remedies provided by N.Y. Exec. Law § 297(9) and the remedies available in [federal court] are mutually exclusive.").

Here, plaintiff filed an administrative complaint before the NYSDHR for discrimination on September 6, 2006 and an administrative complaint before the NYSDHR for retaliation on December 4, 2006.  (See Ozgu Decl., Ex. HH, Plaintiff's Verified Compl. to the SDHR, dated September 6, 2006 & Ex. KK,

---

grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Exec. Law § 297(9) (emphasis added).  Although section 8-502 of the New York City Administrative Code contains a "nearly identical" election of remedies provision, see York, 286 F.3d at 127, plaintiff only raised discrimination and retaliation claims arising under the NYSHRL before the NYSDHR, and, thus, his NYCHRL claims are not precluded.  (See Ozgu Decl., Ex. HH, Plaintiff's Verified Compl. to the SDHR, dated September 6, 2006 & Ex. KK, Plaintiff's Verified Compl. to the NYSDHR, dated December 4, 2006.)

Plaintiff's Verified Compl. to the NYSDHR, dated December 4, 2006.)  By written Determination and Order, the NYSDHR dismissed both of the complaints on the merits on January 16, 2008.  (See Ozgu Decl., Ex. PP, NYSDHR Determination and Order After Investigation, case no. 10113702 (finding no probable cause to believe that DOT engaged in discrimination against plaintiff and dismissing discrimination complaint); Ozgu Decl., Ex. QQ, SDHR Determination and Order After Investigation dated January 16, 2008 (finding no probable cause to believe that DOT retaliated against plaintiff for filing a disability discrimination complaint with the NYSDHR and dismissing the retaliation complaint).)  Approximately six months later, on June 4, 2008, the plaintiff commenced the instant lawsuit in this court, alleging identical disability discrimination and retaliation claims.  (See generally Compl.)

     As plaintiff elected to pursue, and actually litigated, his NYSHRL claims of disability discrimination and retaliation through administrative proceedings before the NYSDHR, the election of remedies doctrine bars this court from considering his NYSHRL claims.  See York, 286 F.3d at 127-28 (plaintiff cannot re-litigate adverse rulings by the NYSDHR in federal court).  Moreover, plaintiff has not alleged, and the court does not find, any exception to the election of remedies rule applicable here because plaintiff's administrative claims

for discrimination and retaliation were dismissed on the merits, specifically on a finding of "no probable cause." See, e.g., Sicular v. N.Y.C. Dept. Of Homeless Services, No. 09-CV-0981, 2010 WL 423013, at *28 (S.D.N.Y. Fe. 4, 2010), report and recommendation adopted by 2010 WL 2179962 (S.D.N.Y. May 28, 2010) ("[W]hen the administrative forum makes a final determination and issues a 'No Probable Cause' determination, plaintiff's NYSHRL and NYCHRL claims are barred from being relitigated in a subsequent civil action in federal court."). The court accordingly does not have jurisdiction over plaintiff's NYSHRL claims, and they are dismissed in their entirety pursuant to Fed. R. Civ. P. 12(b)(1).

Second, the court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims. As the federal ADA claims – the basis for this court's federal question jurisdiction – have been dismissed, the court is left with a discretionary choice as to whether it will retain supplemental jurisdiction over the Complaint's state law claims. See 28 U.S.C. § 1367(c)(3). The court declines to exercise its supplemental jurisdiction over the Complaint's city law claims and those claims are therefore dismissed without prejudice.[22]

---

[22] To the extent that any NYSHRL claims might be found not barred by the election of remedies provision discussed above, the court would likewise decline to exercise supplemental jurisdiction over those claims. See 28 U.S.C. § 1367(c)(3).

See id.; see also Sadallah v. City of Utica, 383 F.3d 34, 40 (2d Cir. 2004) ("[B]ecause plaintiffs no longer have any viable federal claim, any remaining state law claims belong in state, rather than federal, court. The district court should therefore decline supplemental jurisdiction over any state law claims.") (citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.") (additional internal citation omitted)).

## CONCLUSION

Thus, although the court notes that plaintiff may raise potentially meritorious arguments and concerns regarding the propriety of the DOT's now-defunct Limited Duty Assignment Policy under the ADA, the court does not reach the merits of these arguments. For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully requested to enter judgment in favor of defendants, and to close this case.

**SO ORDERED.**

Dated:  April 6, 2011
        Brooklyn, New York

                                    /s/
                          _____
                          **KIYO A. MATSUMOTO**
                          United States District Judge
                          Eastern District of New York